The next case, as you've heard, is Authentic Apparel Group v. United States, 2020-14-12. Mr. Bateson. Thank you, Your Honor, and may it please the Court, it's been my privilege to represent both appellants since the commencement of this breach of trademark license case exactly six years ago today on January 6, 2015. If the Court will permit me, I would like to address the following topics in the following order. First, the granting of the Army's motion for summary judgment dismissing all of Authentic's claims. Second, the denial of Authentic's motion for partial summary judgment as to liability on certain claims. And finally, the dismissal at the pleading stage in 2015 of Mr. Rubin's claims. With respect to the first topic... Didn't the Army do exactly what it had a right to do to reject items that it didn't want to approve? No, it did not, Your Honor. And with respect to that, I would like to direct the Court's attention to its decision on December 23 of 2020 in a case called BGT Holdings v. the United States. Mr. Kushner represented the affilee in that case, and Judge Stoll sat on the panel. In that case, the appellant, BGT Holdings, had entered into a contract to provide a gas turbine to the United States Navy. The contract... But counsel, aside from who sat on that case, who represented the other party, isn't what counts what is in this agreement? Yes, Your Honor. What counts is in this agreement. But this agreement must be used in a reasonable fashion. Right? In the case to which I just referred at page 11 of the slip opinion, which is available on the Court's website, it says... Excuse me, page 12. It says the correct interpretation of, quote, shall consider in this contract does not give the government absolute discretion. But instead holds the government to a duty of good faith and reasonableness. At page... Beginning at the bottom of page 27 of our principal brief carrying over, we point out that for the first two years, a little better than two years of the contract, while we were obliged to pay guaranteed minimum royalties, the Army would not approve any designs that were merchantable, thus leaving us in the position of having the obligation to pay guaranteed minimum royalties and no revenue with which to pay them. It is our contention with respect to the motion for summary, the Army's motion for summary judgment, that the... Wait. Wait. I'm sorry, sir. This new case that you just mentioned is not the subject of a 28-J letter, correct? I just found it last night, Your Honor. Okay. Did you tell opposing counsel that you were going to rely on it this morning? No, Your Honor. I found it last night around 4 or 5 o'clock in the afternoon, and I observed that he represented the government in the case.  Do you... So I don't think... I think he knows more about this case than I do. You are still obligated under our rules to advise opposing counsel of new cases that you plan to rely on in oral argument. All right. I will not refer to it anymore. The answer to the question, however, remains the same. It is not reasonable for the Army to have insisted that we pay guaranteed minimum royalties while refusing to approve any merchantable product from which to generate revenues from which to pay those. More importantly, this is a trademark license agreement. The quid pro quo, we paid guaranteed minimum royalties, an initial payment, and then running royalties in consideration of the use of the trademark for trademark purposes. A trademark, by statutory definition, is an indication of source. The trial court found, in so many words and correctly, that the Army categorically refused to permit its licensee to use the trademarks for trademark purposes, but instead insisted that they be used merely for decoration. Indeed, at his deposition, Mr. Sullivan admitted as much in so many words. So while the Army has discretion, like every trademark owner, to approve and disapprove the use of its mark in a way that is consistent with the best interests of the trademark holder, it cannot categorically refuse a licensee to permit use of the licensed trademark for trademark purposes to wit, identifying the source of the licensed goods as those of the licensor. I believe that's the answer to your question. Mr. Benson, do I have accurate information that between 2011 and 2014, Authentic submitted 491 requests, 41 of which were disapproved? In other words, 90% were approved.  The requests were first initially by email, and then, as Mr. Rubin's testimony makes clear, there were ongoing discussions about the Army's continued rejection, initially, of merchandise that was garishly over-marked and was unmerchantable. To suggest that the entire conversation about the use of the mark is limited to the submissions to which Your Honor refers is inaccurate. Once the Army said, listen, more trademarks, there was no sense for Authentic to continue to submit proposals, requests for approval, that it knew would be denied. There was an ongoing discussion between 2010 and essentially the end of 2012 with respect to the appearance of the goods. Then, Your Honor, there is the issue of merchandising. A trademark has value only with respect to the interrelationship between the trademark and the consuming public. You don't get to that point until you have something to merchandise. The license started in 2010. It wasn't until the very end of 2012 or the beginning of 2013 that Authentic had a mere roughly 200 styles of garments to take to market. Then and only then did the trademark, in a trademark sense, become valuable to Authentic as the contracting party. While the trial court's opinion does not discuss it in more than a single sentence, it is undisputed that they would not permit, that they, the Army, would not permit the use of a trademark for trademark purposes, namely to identify the licensor as the source of the licensed goods or the endorser of the licensed goods. That's an express finding by the trial court. It is well-founded in the record. It was admitted by Mr. Sullivan, the 30B6 witness, at his deposition. It is simply an undisputed fact in this case. And the legal issue presented is whether a trademark licensee has a right to use the license mark for trademark purposes. That is the principal issue in this case. It has been the principal issue since the first conference in 2015 and remains for this It's not, the issue is not do they have a right to exercise control, because as we point out in our briefs, if a trademark owner does not exercise control, becomes a naked license, and the trademark is subject to forfeit. Now... The validity of the trademark isn't an issue here. Absolutely not. I'm sorry, Your Honor. Absolutely not. The validity, indeed, under the licensing estoppel rule, Authentic could never challenge the trademark, right? Assuming it's challengeable. But that's got nothing to do, I suggest, with the contractual obligations of the Army as a trademark licensor. It agreed, it didn't have to enter into this license. The Secretary of Defense did not have to exercise his discretion to permit the licensing of marks within his control. But once he did, he had a contractual obligation from a trademark licensee to use the trademark for trademark purposes. And we well know, based upon the statute, that the purpose of a trademark is identification of source. If there's any doubt about that, the enabling statute incorporates the Lanham Act's definition within its four corners. So when the Secretary of Defense and his delegates, the Army and others, decided to license their trademarks, they were obliged to permit licensees to use them for trademark purposes. For what other reason... Mr. Benson, you questioned the numbers that I mentioned to you. Well, do you have other numbers? What percent of requests were granted? Your Honor, you are correct with respect to the submissions. That is a correct number. But the approval of garments is not the issue. All of the submissions to which you refer, Your Honor, refer to the appearance of garments which used ultimately the licensed trademarks as decorations. The issue in this case is merchandising, not garment design. And the record is clear that when we finally, by the beginning of 2013, had a 200-style line to take to market and began developing merchandising materials, the Army would not permit us to advertise approved, licensed goods as being from the Army as its source or, at a minimum, as its endorser. And that's what this case is about, not about the approval of garments. Well, it is in part about the approval of garments because it's our contention that it took way, way, way too long for the Army to approve merchandise for authentic to sell. As Mr. Rubin testified, and the part of the trial court opinion that troubles me is it completely ignores the breach of the first license, the negotiation of a compromise, the 40% reduction in the royalty rate. So, as Rubin testified, Mr. Rubin, I'm sorry, Your Honor. That's the event. Pardon me? That's the event. The 40% – I'm sorry, Your Honor. I didn't hear you. You broke up. Would you please repeat your question? The 40% reduction in the royalty rate is for your benefit, isn't it? It's for our benefit if, but only if, they permit us to use the trademark for trademark purposes. A trademark license that permits the licensee not to use the trademarks for anything other than decoration, which renders the license itself naked, benefits us not a whit. We signed the license agreement for the purpose of trading on the goodwill of the United States Army with respect to licensed goods. That was the principal object of the trademark license, as it is the principal object of any trademark license. In how many instances did the government take more than 10 days to approve or disapprove your design? Your Honor, I can't give you a precise amount, but I can tell you that with respect to the merchandising material for the critical Christmas holiday season, we submitted requests in October, and it took them until March. And the precise citations to that are in our briefs. And again, the issue is merchandising. The issue is selling this goods, not getting it approved so we can manufacture it. The issue for any trademark licensee is trading on the goodwill that it, in quote, purchases via the trademark license to sell goods, because the licensee, as was the case here, is a complete unknown. Shall we save the remainder of your rebuttal time, Mr. Bates? I would like to say one other thing. As we point out in our brief, with respect to Mr. Rubin's claim as an intended third-party beneficiary, the question is, is it plausible? If the 40 percent reduction wasn't to help him, who was it there to help? And now I will stop, sir. Thank you. We will save four minutes for you, Mr. Bates. Mr. Kushner. Thank you. Good morning, and may it please the Court. I'd like to start with Sandic Apparel's primary argument, which is that it was somehow not allowed to use the trademark for a trademark purpose. The agreement- Before you begin, Judge Dyke, let me ask you a question. As I understand it, the licensee here was required to pay substantial minimum of regardless of how many items they sold, correct? That is correct. Okay. As I read your position, the government had no obligation under this agreement to approve any proposed design. Is that your position? That is correct, but with a caveat. The way this agreement is set up, the Army has a contractual obligation to substantively analyze and consider the licensee's submissions. So if the Army failed to do that, if the Army simply takes in submissions and says, you know what, licensee, we don't like you, we don't care what your submissions look like, we are just going to disapprove them outright, if the Army had done that, then that could possibly be cause for a breach of contract claim, because that is outside the realm of the exculpatory provision. Suppose they are arbitrary rejections. There is no remedy for an arbitrary rejection? If the Army had substantively reviewed the submissions and rejected them arbitrarily, if I understand the hypothetical, then yes, the exculpatory clause would kick in and it would not allow a damages claim against the government. The reason is, Your Honor, because there has to be some added value from the exculpatory clause. If the court had the authority to review every single submission under the APA-style rational basis review, then the only provision that would go into play is the provision that gives the Army discretion, because as we explained in our brief, discretionary decisions are reviewed under that deferential standard. But this contract not only has a provision that gives the Army discretion, it also has a provision that clearly and unequivocally exculpates the government from liability based on how the government exercises that discretion. Suppose the government acted in bad faith, no liability? Again, as long as the government substantively reviewed and considered the licensee submissions, then yes, it would still be no liability. And Your Honor, I would refer you back to the Wells Brothers case that we cite. That was a delay claim in a construction case, but the court didn't ask there what the reason for the delay was. It didn't matter whether the government gave a good reason for the delay or a made-up reason for the delay. The exculpatory clause applied, and because the government had that discretion over delay, the government could not be sued for damages that were occasioned by the delay. That case only involved one feature, the delay feature of the government's obligations, whereas here you're saying the government has no obligations other than to consider this. I mean, it seems like an unlikely interpretation of the contract, given the covenant of good faith and fair dealing to say that the government can act in bad faith and escape liability. That seems extremely odd. But in any event, I understand your position is that the government nonetheless acted reasonably here. Certainly, but going back to the duty of good faith and fair dealing, that duty certainly still applies to this contract, but as this court has held time and again, the implied duty of good faith and fair dealing cannot displace express contractual provisions. It cannot change the bargain that the party expressly agreed to. And if the court applied the duty of good faith and fair dealing to the exculpatory clause, we think that that's exactly what this duty would do. It would displace the exculpatory clause, which was bilaterally negotiated by the party. Authentic Apparel agreed to exculpate the government from any liability based on how the army exercised its discretion over approval. That provision must have meaning. As the Supreme Court said in Wells Brothers, it cannot be treated as meaningless and futile and read out of the contract. And we ask that the court do that here as well. But Your Honor is correct. We also point out that there is certainly no bad faith. There's no violation of the duty of good faith and fair dealing here because all the discretionary disapprovals by the army had a very much irrational faith. Now, going back to Authentic Apparel's primary argument, this idea that it was not allowed to use the trademarks for a trademark purpose, and that seems to go back to this idea that any use of a trademark has to be an indication of the trademark's primary source. So there's two problems with that argument. The first one is that in section 2.4 of the agreement, which the court can find on page 7946 of the joint appendix, Authentic Apparel expressly agreed, and I quote here, Licensee may not state or imply, either directly or indirectly, that it is supported, endorsed, or sponsored by owner. So it agreed that it cannot represent to the general public that the army either supports or endorses or sponsors its products in any way. Now, as a broader point about trademark licensure, the view that Authentic Apparel has presented to this court through its brief, and again today, is the old view of trademark licensing that has not applied in this country for many decades. Under the modern view, trademark licensing is permissible even when trademarks are used as decorations, and even when those trademarks are not used to identify the primary source of the goods. As long as a licensed store imposes some quality controls over the items that bear its marks. And this can be seen in merchandising agreements that are very much prevalent in today's economy. If you consider, for instance, an organization like the New York Yankees that has a trademark over its logo. The Yankees license their trademark to companies that make all kinds of items, from coffee mugs to keychains to earrings, all bearing the New York Yankees logo. And those are all decorative uses of the mark that do not indicate the primary source of the item. No one thinks that the New York Yankees are manufacturing earrings. But they are all permissible uses of the trademark, so long as the Yankees impose some quality controls over the use of the mark. And that is exactly what the Army did here. There is no indication by authentic apparel that the Army did not properly impose quality controls. In fact, if anything, the opposite is true, because authentic apparel has alleged that the Army too strictly tried to preclude certain uses of its marks, which is the very type of quality controls that a licensed store is supposed to impose. If the court is interested in this... Mr. Kushner, is there any precedent interpreting a trademark license from, say, the Army or the Yankees or a similar group as not necessarily relating to and certifying origin, but relating more to decorations? Your Honor, there's lots of precedent on this. This idea is known as secondary source identification, and it's the idea that a trademark usage, when a trademark is licensed, can properly signify only the secondary source, which is the licensed store's authority to use the mark. There is a lengthy discussion of this in the preeminent treatise on trademarks. It's a treatise that the Supreme Court has cited many times. It's called McCarthy and Trademarks and Unfair Competition. And in sections 18,39 to 18,41, there's a long discussion of the old view that authentic apparel has articulated today and how that view has developed over the years. And that doesn't amount to a naked license. It does not, Your Honor. To be a naked trademark license, a licensed store would have to license its trademarks without quality controls. That is what makes a license a naked license. That is different for assignments. It's not a license in gross. Those two terms have been used interchangeably sometimes, but there's a distinction between what makes a trademark license a naked license and a trademark assignment a naked assignment. It is true that when a licensed store, or I'm sorry, a trademark owner assigns its license, that assignment has to be made with the goodwill that is associated with the trademark, and courts look to whether it's assigned to a company that essentially manufactures or makes the same type of items of the goodwill and move to the assignee from the assignor. That is not the appropriate analysis for trademark licensing. When it comes to licensing, as long as the licensor imposes quality controls, it is a permissible trademark license, even if the trademark is used in a decorative way. Your Honor, you asked for cases. The case we cited in our brief is the General Motors Corporation, the Gibson Chemical and Oil Corporation. It's a Second Circuit case from 1986. In that case, there was a transmission fluid that GM licensed the name of that fluid to various companies, and the company that was making counterfeit products, Gibson, it argued that this licensing program that GM had essentially deprived the trademark of Lanhamac protection because it did not indicate the source of the mark. Because, you know, different companies could say that they are the manufacturer of this Dextron II transmission fluid instead of GM. And the court said that does not deprive the trademark of Lanhamac protection because a trademark can properly be used without displaying the licensor's name. It can simply display the trademark and the name of the licensee. And McCarthy and trademark... You mentioned the quality control as being an essential aspect of the license, and I assume it's your view that the right to approve the products is evidence of the quality control being in the agreement. That's correct. That's correct, Your Honor. Section 5.1, which discusses the approval process under the license agreement, imposes not only discretion on the Army in its ability to approve or disapprove marks, but it also has a lengthy discussion of the various stages of the approval process, the fact that Authentic Apparel had to seek approval of its designs in the concept stage and the prototype stage, and then it had to submit actual samples of clothing in the final stage. And it also discusses the fact that the Army had discretion to disapprove those items at every single stage of that process. So what Section 5.1 establishes is precisely the type of quality controls that are required for a valid trademark license. Anything further? Your Honor, unless there are further questions from the Court, I did want to mention one last thing. There was a discussion of the BGT Holdings case, and Judge Dyke correctly pointed out that Authentic Apparel did not advise of its intent to reference that case today, but I am familiar with that case. I was the attorney on that case. It's a very different situation than the one here. The BGT Holdings case arises out of a CDA contract in which the contract said that the contracting officer, quote, shall consider, end quote, an equitable adjustment. But the Court found just recently that the shall consider language did not give the Army discretion. And the reason is because the CDA contract that issued there did not have a provision that expressly said the contracting officer has discretion of whether to give an equitable adjustment to the contractor. That is in direct conflict with the agreement we have here, which in Section 5.1 and again in Section 14.3 expressly says that the Army has sole and absolute discretion over approvals. So in this case, we have a provision that expressly provides discretion to the government, and when that is the case, even if Authentic Apparel is able to overcome the exculpatory clause, the Court really should review that discretionary decision under the highly deferential APA standard of review. With that, if there are no further questions, I want to thank the panel and again ask the Court to affirm the trial court's decision. I have one more question. You just said we should review it under the APA standard, and yet earlier in your argument you said there's no review at all. How is that consistent? That's correct, Your Honor. It's essentially an argument in the alternative. So there is no review under the exculpatory clauses, but in the event Authentic Apparel is somehow able to overcome the exculpatory clauses, which, again, as we explained, it should not, but in the event that it is, the appropriate standard of review is the rational basis standard of review, according to which if the Army articulated a rational basis for its discretionary decision, then the Court must affirm that discretionary decision without second-guessing the Army's considerations. So in the event Authentic Apparel can somehow overcome the exculpatory clause, that would be the appropriate standard of review to apply. Thank you, Mr. Kushner. Mr. Bainton has four minutes for rebuttal. Thank you, Your Honor. First, Mr. Kushner, having mentioned the BGT holdings case, I would like to point out at page 12 of the slip opinion the Court wrote the following, quote, the correct interpretation of, quote, shall consider, unquote, in this contract setting does not give the government absolute discretion, but instead holds the government to a duty of good faith and reasonableness, unquote. That is what the BGT case holds, and we believe that the government had to exercise a degree of reasonableness with respect to not only product approval, but again, more importantly, merchandising. Second, with respect to much of what Mr. Kushner just said, I would direct the Court's attention to the record beginning at appendix page 3376. In our briefs, we talk much about what are called two Army, quote, the U.S. Official Army Licensing Asset Guide. One was applicable to the first license. One was applicable to the second license. The third iteration prepared after this lawsuit is now called, quote, U.S. Army Brand Guidelines for Licensed Products. I ask that you consider it in reaching your decision, because you will see that the brand guideline with respect to packaging does not particularly address merchandising, gives licensees exactly what we claim we're entitled to, namely to merchandise our product as part of the U.S. Army brand, part of the U.S. Army brand, and that's exactly what that document shows. Next, with respect to the Wells decision and the Companion decision, both of those cases involve contracts to construct something in which the possibility of delay was known to the contracting parties, the allocation of the risk of loss was assigned to the contractor, and the contract was enforced according to its terms. In this case, the object of the contract is not the construction of something, but rather the licensing of trademarks. And if we're not permitted to use the trademarks for trademark purposes, namely to identify the Army as the source or at a minimum the endorser of the licensed products, the principal object of the contract was frustrated, and the trial court should not have interpreted the contract in a way that frustrated its very object. That is all I have by way of rebuttal. I hear no further questions, so I thank you. I thank both counsel and the cases submitted. The Honorable Court is adjourned until tomorrow morning at 10 a.m.